Filed 7/15/26  In re A.R. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | |
| | D087506 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J521671) |
| v. | |
| LEILANI R., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Alexander M. Calero, Judge.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of County Counsel, Damon M. Brown, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Indra N. Bennett, Deputy County Counsel, for Plaintiff and Respondent.

Leilani R. (Mother) appeals orders of the juvenile court removing her 14-year-old daughter, A.R. (Child), from Mother's custody. She claims there was insufficient evidence of substantial danger to the Child if she remained with Mother, that the Agency made reasonable efforts to prevent removal, or that there were reasonable means to prevent removal. We find the trial court's orders were supported by substantial evidence that Mother and her partner (Stepfather) created an unsafe environment for Child due to alcoholism and domestic abuse and had not taken significant steps to remediate those conditions at the time of the hearing. We therefore affirm.[1]

FACTUAL AND PROCEDURAL BACKGROUND

Child contacted law enforcement at 3:30 a.m. on August 4, 2025, to report that Mother was injured. Child did not witness the injury, but suspected Stepfather had hit Mother with a vase of roses. According to the responding officer, Mother was "highly intoxicated and bleeding profusely from the back of her head." The officer said she had slurred speech and he "could smell the presence of an alcoholic beverage coming from her person." He "asked her multiple times about the why she was bleeding," and Mother would not answer. Stepfather said "that she hit her own head." Mother was "very uncooperative and . . . tried to force [Child] into the room as to keep her from talking to Officers." Mother "was yelling at [Child] and pointing her finger in her face to not speak to police."

Child told police that Stepfather and Mother had been arguing, so she decided to go to bed. Stepfather woke her up because Mother was bleeding

---

[1]     Mother's late-filed reply brief has been accepted for filing and considered in connection with this opinion.

2

and refused to go to the emergency room. Child said that Mother had been drinking that day. She reported witnessing daily arguments between Mother and Stepfather and said, "physical violence is common [in] the house."

The matter was referred to the San Diego County Health and Human Services Agency (Agency), which began an investigation. The assigned social worker attempted to visit the home twice on the day of the incident, but no one answered the door, so a police officer was sent on a welfare check. The officer said that Mother "looked intoxicated" and that "[h]er demeanor was aggressive and was not cooperative. Mother told the officer that Child was at her grandmother's house and called Child so the officer could confirm she was okay. She refused to share the grandmother's address or phone number and "slammed the door."

The next day, a social worker made an unannounced visit to the apartment. She observed that Stepfather had a black eye, and mother had a large bruise on her arm. The social worker "detected a strong smell of alcohol on the mother's breath" and noted Mother's "overall appearance evidenced poor self-care." Mother "denied any domestic violence or alcohol use."

Mother was not cooperative during further visits. When the social worker wanted to interview Child, Mother became "highly upset" and only allowed them to speak briefly and outside of the apartment. When the social worker "discussed the creation of a safety plan such as [Child] temporarily staying at her paternal grandmother's," Mother "energetically declined." Mother also rejected the social worker's proposal that Stepfather leave the home temporarily.

Child's paternal grandmother (Grandmother) "described the mother as 'very sick with alcohol use' " and "reported 'constant domestic violence' in the home." Mother's downstairs neighbor said Mother and Stepfather have "

3

'altercations every week,' " and that "she frequently hears the mother and stepfather 'talking in a strange way, as if they are drunk.' "

The Agency also obtained police reports documenting a significant history of alcohol use and domestic violence in the home. In May 2022, Mother and Stepfather argued after he had been drinking. Stepfather threw items around the house before pushing Mother to the ground, taking her keys and leaving to sleep in the car. The next morning, when Stepfather returned, he pushed Mother to the ground again. Mother suffered a one-inch head laceration that required treatment at the hospital.

In March 2023, Mother dropped Child off at school and got back home around 8:00 a.m. When she got home, she and Stepfather got into an extended argument, during which Stepfather drank "an entire bottle of whiskey and a bottle of absinthe" and broke their television and a mirror. He then demanded that Mother take him to the liquor store. When she said no, " 'he found a bottle of red wine and proceeded to chug half the bottle and pour the rest of it on [Mother] and the couch.' " He then went to lie down in Child's room. When Mother discovered him there, she told him he needed to get out, "so he got up and busted [Child's television], then came after [Mother], grabbed [her] hand and bit [her], then grabbed [her] shoulders and head-butted [her] causing [her] to fall backwards into [Child's] easel breaking it and hitting [her] head on the wall." Mother also said Stepfather spat on her and "punched the walls in several different places throughout the apartment." Mother indicated she was "not sure at this time if she wishes to assist with prosecution."

In a March 2025 altercation, Stepfather "grabbed [Mother] from the back [of] her neck," "slapped her . . . on the right side of her head once," and

4

spat on her several times. Mother said she was unsure if she wanted to press charges.

Mother and Stepfather married in May 2025. The next month, they again got into an argument after Stepfather had been drinking, and he hit her. It appeared to responding police that Mother was also intoxicated. She refused to provide Stepfather's name or cooperate with the officers.

When the social worker asked Mother about these prior incidents, she "denied any domestic violence has taken place, and insisted those were misunderstandings, and that Police officers are being fired for 'misrepresenting' things." When asked about the most recent incident, Mother denied Stepfather hit her, claiming instead that Stepfather "was giving her flowers and she had" fallen and hit her head. She denied she was intoxicated that night.

Based on its investigation, the Agency filed a petition under Welfare and Institutions Code[2] section 300, recommending that Child be removed from Mother's care. The Agency's report notes that proposed alternative safety plans, short of removal, were declined by Mother. These included Stepfather leaving "the home while the investigation is conducted and the course of action determined," and Child temporarily staying with Grandmother. The report noted:

> At 14 years old, [Child] is at a critical stage of emotional, social, and cognitive development. Witnessing her mother being physically assaulted, living with constant conflict, and observing heavy alcohol use, normalizes unsafe and unhealthy relationship dynamics. Such experiences can [cause] chronic[ ] anxiety, fear, and emotional distress, impair her academic and social performance, damage her trust in caregivers, increase her risk of

---

2     Further statutory references are to the Welfare and Institutions Code.

depression an[d/]or future involvement in abusive relationships. The repeated exposure to violence and intoxication also places [Child] at risk of direct physical harm, either by being caught in the middle of an altercation or through the neglect and violence that often follows substance abuse.

On August 15, the Court agreed with the Agency's recommendations and detained Child with Grandmother, ordering liberal supervised visitation and voluntary services for Mother and Stepfather. The court set a jurisdiction and disposition hearing.

On December 22, 2025, after Mother requested several postponements, the court held the hearing. Mother called a representative from her substance abuse program, who testified that Mother was enrolled in "two groups a week," although she could not recall which ones, and "is considered in poor compliance due to attendance concerns."

Mother testified that she had fallen on a step and injured herself in May 2025. She claimed that her head injury resulted in "post-concussion syndrome," which manifests in memory loss, impaired motor function, and slurred speech. She also said she was prescribed a muscle relaxant for back pain and agreed that it could "also contribute to slurred speech."

Mother claimed that on August 4, she "was baking in the kitchen, and due to [her] vertigo, loss of balance, loss of depth of field, [she] spun around too quickly and hit [her] head on the back of the hinge on the door, and it was very pretty severe." She said that Stepfather was helping her attend to her wound, and "after a few minutes, when [they] could not stop the bleeding," they asked Child to call for an ambulance. She denied that she had been intoxicated that night, stating she had been sober since July 27.

Mother said she had completed a parenting program and was participating in substance abuse and domestic violence programming. She

6

testified domestic violence was not present in her life "on a regular basis," and said there had been one incident over a year earlier.

The court found "there has been ongoing domestic violence in the home between the mother and [Stepfather]. There is evidence that domestic violence has taken place from 2022 to as recently as August of 2025." With respect to Mother's claim about medication or her concussion making it appear as though she is intoxicated, the court found "other indications of alcohol use by [Mother], for example, observations by law enforcement as well as the social worker." The court found Mother's testimony not credible as to the August 4 incident, noting conflicting evidence was "documented close in time to the event itself" and that those statements "appear to corroborate one another."

While the court noted the parents had made some "progress in voluntary services to address these protective issues," the court found "that there is a defined risk of harm that still exists here." The court noted that the parents had "not yet acknowledged the extent and impact of their domestic violence" and "do not appear to possess the necessary insight into that protective issue." In particular, Mother "appear[ed] to deny that domestic violence is part of her current situation" despite evidence to the contrary. The court also found that Mother was "struggling to engage more fully in her substance use program," and while "consider[ing] the challenges that [Mother] has faced," "her lack of ability to more meaningfully engage in those programs reflects on the state of the protective issues here."

Based on these facts, the court found "the Agency has met its burden by a preponderance of the evidence that the allegations in the petition are true," and "by clear and convincing evidence that removal of [Child] from the parents is appropriate at this time." The court found "[r]easonable efforts

7

were made to prevent or eliminate the need for removal" and that "there are no reasonable means by which [Child's] health can be protected without removal."

## DISCUSSION

### A.    Substantial Evidence of Danger to Child

Mother first argues there was insufficient evidence of substantial danger to Child to support removal.  A child cannot be removed from the physical custody of their parents "unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home."  (§ 361, subd. (c)(1).)  "On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence."  (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809 (*Ashly*).)

Mother appears to claim that, because "the court's comments [concerning the evidence] were about the jurisdictional finding," the court failed to make factual findings in support of removal under the clear and convincing standard.  We do not think this is a reasonable reading of the court's statements.  After summarizing the pertinent evidence, the court explained, "The information that I have already highlighted and other information in the reports supports a finding by clear and convincing evidence that removal of [Child] from the parents is appropriate at this time." This demonstrates that the court applied the appropriate standard to its dispositional findings.

8

In her brief, Mother does not dispute that there were serious issues of alcohol abuse and domestic violence in the home. Rather, Mother argues "the circumstances of the family in December showed that Mother had progressed since August such that there was not clear and convincing evidence of a risk of substantial danger if [Child] returned home." Mother fails to point to any significant progress that would mitigate the risks to Child's "physical health, safety, protection, or physical or emotional well-being." (§ 361, subd. (c)(1).)

Mother suggests her medical issues made it more difficult to participate in her substance abuse counseling and domestic violence classes. The court expressly considered that Mother had "challenges . . . regarding her ability to more fully engage," but nonetheless stated, "I also need to consider how her lack of ability to more meaningfully engage in [these] programs reflects on the state of the protective issues here." In other words, whatever the reason, Mother failed to participate in programming, the court found that she had not made significant progress in working on her substance use and domestic violence problems.

Mother also suggests she was confused about the need to participate in domestic violence programming. She claims that in November 2025, she "expressed frustration and stated that she did not understand why the Agency continued to reference domestic violence, as she felt that it was no longer part of her current situation." She also "shared concerns about continuing in the domestic violence program if it might negatively affect her case." But this supports the court's findings, as it demonstrates that Mother continued to deny or minimize the evidence of continual domestic violence in her relationship. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) In any event, the court

was entitled to consider Mother's failure to progress in her programming, regardless of the reasons.

Mother also points to an "Intimate Partner Violence Victim Treatment Quarterly Progress Report" dated November 23, 2025, highlighting that she had admitted to drinking and arguing with Stepfather, and "said that the couple's aggressive communication style was not acceptable and she wanted to do 'better' as a parent." This report supports, rather than undermines, the juvenile court's findings. In it, Mother received generally low scores on her participation metrics. The report noted Mother had only attended 8 out of a minimum 26 sessions, and she had not acknowledged domestic violence in her relationship or the impact of the domestic violence on Child. According to the therapist's notes, Mother told the group that the August 4 incident was a "misunderstanding," and Stepfather had "surprised her with flowers from behind, and when she turned around, she accidentally tripped and fell, causing her to hit her head and bleed profusely." The report concludes, "Therapist believes that [Mother] needs more time to show definite progress in most areas." In context of the broader report, Mother's acknowledgment that she and Stepfather drank and argued does not show significant insight into these problems, let alone progress in addressing them.

In sum, Mother has not demonstrated that the juvenile court's substantial danger finding lacked sufficient evidentiary support.

## B. Substantial Evidence of Reasonable Means and Efforts to Prevent Removal

Mother next argues that the court did not consider reasonable means to prevent removal and improperly found that the Agency made reasonable efforts to prevent the need for removal. In addition to finding a substantial danger to Child, the juvenile court was required to find by clear and

convincing evidence that "there are no reasonable means by which [Child's] physical health can be protected without removing [Child] from the [Child's] parent's . . . physical custody." (§ 361, subd. (c)(1).) Separately, the court was required to "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of [Child] from their home." (§ 361, subd. (e).) We review these findings for substantial evidence. (*Ashly, supra*, 225 Cal.App.4th at p. 809.)

Mother claims there is insufficient evidence that the Agency made reasonable efforts to eliminate the need for Child's removal after the initial detention report in August. In fact, the Agency's disposition report indicates that its continued efforts included referrals to parenting and domestic violence classes for both parents. The Agency found that "mother has consistently minimized or denied the severity" of the alcohol abuse and domestic violence in the home and "has not taken meaningful steps to protect" Child. The Agency concluded that "mother's ongoing pattern of behavior—remaining in violent relationships, failing to seek medical care for her own injuries, and continuing to abuse alcohol—creates an unstable and unsafe environment. This exposes [Child] not only to the trauma of witnessing violence but also to the risk of direct physical harm." The Agency further noted that "[C]hild's recent act of contacting law enforcement highlights both the immediacy of the danger and [her] lack of confidence in her mother's ability to protect her." Subsequent addendum reports commend the parents for engaging in services but note that "concerns remain at this time regarding the child's overall safety if returned to the home."

Mother does not dispute that the Agency documented adequate efforts to prevent removal in its detention report. Subsequent reports document that the Agency tried to get Mother to engage in services that would help her

11

prevent further harm to Child. Instead, Mother continued to deny the existence of the protective issues and failed to participate fully in available support services. We therefore find substantial evidence supporting the trial court's determination that the Agency made reasonable efforts to prevent removal.

With respect to reasonable alternative means by which Child's physical health could be protected, as noted above, the record supports the juvenile court's finding that Mother failed to make significant progress in her domestic violence or substance abuse programming. The court reasonably concluded that Mother's failure to meaningfully address the risks to Child in the home meant there was "a defined risk of harm that still exists." Thus, there was a sufficient basis for the court's finding that there were no reasonable means by which Child could be protected absent continued removal.

Mother claims this case is similar to *Ashly, supra*, 225 Cal.App.4th 803. We disagree. In *Ashly*, children were removed from parents following physical abuse by their mother. (*Id.* at p. 806.) The father opposed the physical abuse when he learned of it, telling mother he would leave her if it happened again. (*Ibid.*) The social services agency detention "report did not mention any reasonable alternatives to removal from the home that had been tried and failed or that had been considered and rejected." (*Id.* at p. 807.) The disposition report similarly did not mention any reasonable alternatives to removal. (*Ibid.*) The mother moved out of the family home after the incident and, although she moved back in before the disposition hearing, she testified she had only done so because the children were not there. (*Id.* at p. 808.) The mother "admitted [to] losing her temper and using physical discipline," and she expressed remorse. (*Id.* at pp. 807–808.)

12

The court of appeal found there was "[n]o discussion of reasonable efforts" to prevent the children's removal in the record or in the juvenile court's order. (*Ashly, supra*, 225 Cal.App.4th at pp. 809–810.) The court further found that the juvenile court had not considered whether removing the offending parent from the home was a reasonable way to protect the children, which was notable given that mother had removed herself from the home after the detention hearing. (*Id.* at p. 810.) Finally, the court noted that these errors were prejudicial because "[m]other had expressed remorse for the injuries she inflicted on [her child] and was enrolled in a parenting class 'to learn other ways to discipline [her] children' "; the father "had already completed a parenting class"; and the agency should have considered "unannounced visits," "public health nursing services, in-home counseling services," and removing mother from the home. (*Ibid.*)

Here, unlike in *Ashly*, the Agency's detention report did discuss reasonable alternatives to removal—including Stepfather moving out—which Mother "energetically declined." The Agency's disposition report then noted that the Agency had offered services to avoid continued removal, but Mother had not made significant progress and "ha[d] not taken meaningful steps to protect" Child. Unlike the mother in *Ashly*, who admitted her conduct and expressed remorse, Mother has continued to deny that there is domestic violence in her relationship and minimize her evident history of alcohol abuse. And here, unlike in *Ashly*, there is no non-offending parent to care for Child.

Mother claims "there are in-home services and the Agency could make unannounced visits" to protect Child. Mother fails to explain what kind of in-home services would mitigate the risks to Child, and we find the trial court did not abuse its discretion by concluding that unannounced visits were

13

inadequate considering the long and serious history of domestic abuse and alcohol use. We cannot say that the court abused its discretion by implicitly finding these were inadequate means to protect Child if she remained in the home.

Mother also argues Child "has proven mature enough to recognize if she suspected domestic violence and alcohol consumption." She claims, "There is no evidence to suggest [Child] could not follow a safety plan that involved calling law enforcement, reporting to the Agency and contacting her paternal grandparents if she thought she was no longer safe in the family home after return." As the Agency noted in its detention report, "[a]t 14 years old, [Child] should not be placed in the position of seeking outside intervention for her own safety. This indicates a serious breakdown in the parent-child relationship and in overall family protective capacity." Moreover, Mother has tried to prevent Child from speaking to law enforcement and Agency representatives. We cannot find that relying on Child to identify risk factors and seek outside assistance, potentially over Mother's objections, is a reasonable alternative plan to protect Child.

Finally, Mother briefly argues that the trial court failed to "state the facts on which the decision to remove the minor is based," as required by section 361, subdivision (e). Mother has forfeited this argument by failing to present it under an appropriate heading. (*Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1065 [" 'Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading.' "].) In any event, if we were to reach the issue, we would find that the trial court's stated findings were adequate. As discussed above, the evidence discussed on the record amply supports the court's conclusion that removal was necessary.

14

## DISPOSITION

The orders of the juvenile court are affirmed.

McCONNELL, P. J.

WE CONCUR:

KELETY, J.

CASTILLO, J.

15